# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TENNESSEE
# AT GREENEVILLE

| | |
|---|---|
| RONNIE COOPER | ) |
| | ) |
| Petitioner, | ) Case No. 2:15-cv-317 |
| | ) |
| v. | ) District Judge R. Leon Jordan |
| | ) |
| UNITED STATES OF AMERICA | ) Mag. Judge Christopher H. Steger |
| | ) |
| Respondent. | ) |

## MEMORANDUM OPINION

### I.   Introduction

Following a jury trial, Petitioner Ronnie Cooper was convicted of (1) distribution and possession with intent to distribute cocaine; (2) distribution and possession with intent to distribute cocaine base; (3) distribution and possession with intent to distribute marijuana; (4) money laundering; and (5) witness intimidation [*See* Doc. 398 in 2:09-cr-45]; *United States v. Miller*, 562 F. App'x 272, 277 (6th Cir. 2014).

This Court then sentenced Petitioner to a term of 360 months' imprisonment based, in part, on the application of the Career Offender Guidelines under U.S.S.G. § 4B1.1(a) [*See* Docs. 808, 841 in 2:09-cr-45]. The Court also imposed a sentence of eight years of supervised release and a $500 special assessment [Doc. 844 in 2:09-cr-45] and entered an order of forfeiture against Petitioner in the amount of $7 million [*See id.*; Doc. 776 in 2:09-cr-45].

Petitioner and his co-defendants then appealed their sentences to the Sixth Circuit [Doc. 845 in 2:09-cr-45]. As to Petitioner, the Sixth Circuit held that "[t]he evidence at trial presented [Petitioner] to be one of Maddox's [a co-defendant] surrogates, conducting retail sales, buying kilograms of cocaine, and operating 'trap houses' from which he sold crack cocaine. In this sense,

his role was intertwined and interdependent on the other members of the conspiracies, even if he did not work with them directly." *Miller*, 562 F. App'x at 304.

After the Sixth Circuit's ruling, Petitioner filed a petition for a writ of certiorari with the Supreme Court [Doc. 966]. His petition was denied [Doc. 969 in 2:09-cr-45].

Petitioner then filed the present Motion to Vacate, Set Aside, or Correct His Sentence under 28 U.S.C. § 2255 [Doc. 1], claiming that Rush (another co-defendant) made pretrial statements to the Government that Petitioner had nothing to do with Maddox's drug-distribution ring [Doc. 2]. Those alleged statements—if they were in fact made by Rush—were never disclosed to Petitioner before trial. Consequently, Petitioner contends that the Government failed to divulge exculpatory evidence and, in doing so, violated his rights under *Brady v. Maryland*.[1]

For reasons that follow, the Court finds that an evidentiary hearing is necessary, and Petitioner's § 2255 Motion [Doc. 1] will be **GRANTED IN PART** to the extent that Petitioner is entitled to an evidentiary hearing. Petitioner's Motion for Discovery [Doc. 11] will also be **GRANTED.**

## II. Facts

Following a 2010 trial with six co-conspirators, a jury convicted Petitioner on several counts related to his alleged involvement in a drug distribution ring based out of Johnson City, Tennessee. Petitioner's brother-in-law, Sunnah Maddox, led the distribution ring. "The primary thrust of the drug-trafficking operation was to purchase kilogram quantities of cocaine, cook it into crack cocaine, and resell the drugs in smaller quantities." *Miller*, 562 F. App'x at 277. Maddox resided in Johnson City with Jamie Rush, but had suppliers and engaged in drug trafficking in Georgia, Florida, and New York. *Id.* To reach the suppliers, the two would "hire women as

---

[1] 373 U.S. 83 (1963).

couriers to transport money and drugs; in addition, various members of the operation would send wire transfers through Western Union to these different locations." *Id.*

The DEA became aware of Maddox and Rush's operation after agents arrested a drug dealer who divulged that Maddox was his supplier. DEA agents "set up a transaction between [the dealer] and Maddox, and obtained a Title III wiretap on Maddox's phone that ultimately generated 25,000 intercepted communications." *Id.*

"Based on their investigation, law enforcement officers . . . . orchestrated a traffic stop to catch Maddox and Rush, and a female courier en route to Atlanta to purchase a kilogram of cocaine. The officers found $31,500.00 in cash in the courier's car." *Id.* Then, about four months later, "officers coordinated a search of Maddox and Rush's residence with a traffic stop of their vehicle as they returned from another drug purchase in Atlanta." *Id.* At that time, officers arrested "Miller and Dorsey, and courier Taneka Ebberts, who had returned from Atlanta ahead of Maddox and Rush. A search of the rental car Ebberts had driven to Atlanta uncovered about one and a half kilograms of cocaine and 67 grams of marijuana in the trunk. Maddox and Rush were also arrested." *Id.*

A grand jury in the Eastern District of Tennessee then returned a Third Superseding Indictment against Petitioner, Maddox, Rush, Carr, Miller, Dorsey, DeJesus, Ruffin, and others on twenty counts, *to wit*:

> conspiracy to distribute and possess with the intent to distribute 5 kilograms or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846 (Count 1); aiding and abetting the distribution of 500 grams or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B), and 18 U.S.C. § 2 (Count 2); conspiracy to distribute and possess with the intent to distribute marijuana, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(D) and 846 (Count 3); aiding and abetting the distribution of marijuana, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(D), and 18 U.S.C. § 2 (Count 4); conspiracy to distribute and possess with the intent to distribute 50 grams or more of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846 (Count 5); conspiracy to launder money, in violation of 18

U.S.C. §§ 1956(a)(1)(A)(i) and 1956(h) (Count 6); distribution of cocaine and cocaine base and the aiding and abetting of cocaine base distribution, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B)-(C) (Counts 8 and 15); manufacturing and the attempt to manufacture 50 grams of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A) and 846 (Count 12); aiding and abetting of money laundering, in violation of 18 U.S.C. §§ 2 and 1956(a)(1)(A)(i) (Count 13); unlawful possession of ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e) (Count 16); and witness intimidation and conspiracy to commit witness intimidation, in violation of 18 U.S.C. §§ 371, 1512(b)(1), and 1513(b)(2) (Counts 18, 19 and 20).

*Id.* at 277-78. The Government charged Petitioner with: (1) distribution and possession with intent to distribute cocaine (Count 1); (2) distribution and possession with intent to distribute cocaine base (Count 5); (3) distribution and possession with intent to distribute marijuana (Count 3); (4) money laundering (Count 6); and (5) witness intimidation (Count 20) [*See* Doc. 398 in 2:09-cr-45].

At trial, Maddox's one-time roommate and friend, Jamie Rush, testified on behalf of the Government. Rush was charged along with the other defendants; however, as a part of his plea agreement, he agreed to testify. Rush testified that, in 2004, he and Maddox "began procuring about 1.5 kilograms of powder cocaine per month and cooking it into crack cocaine to sell. This amount eventually increased to one kilogram every week or two from a source that Maddox found in Atlanta." *Miller*, 562 F.App'x. at 278. "While Maddox generally did the cooking himself, Rush testified that he personally cooked at least forty kilograms of cocaine into crack cocaine for Maddox. According to Rush, Maddox kept the profits from drug sales and provided Rush with cars, cash, jewelry, computers, and cell phones." *Id*. "Rush also testified that Carr, Dorsey, Miller, and DeJesus all played a role in Maddox's operation and stayed at Maddox's apartment in Johnson City at various times." *Id.* Rush did not, however, specifically mention Petitioner as being a part of the conspiracy.

The government did introduce evidence against Petitioner at trial: "[t]he bulk of the government's evidence [against Petitioner] came from two jailhouse informants: Trewayne Sanders and Daniel Ballinger. Sanders testified that he witnessed [Petitioner] sell powder cocaine to Sanders' father on several occasions in New York. Ballinger testified that, while in jail together, [Petitioner] told him that [Petitioner] 'was buying kilos of crack, of powder cocaine from a Mexican, and he was coming from Utica, New York, to Tennessee to sell drugs.'" *Id.* at 294-95. Ballinger also testified that Petitioner "said he would buy kilos of pure cocaine for $27,000 and sell 'ounces of crack cocaine for a thousand dollars apiece to individuals.' According to Ballinger, [Petitioner] said he had multiple associates and people working for him, and that he operated 'trap houses' from which he sold crack cocaine." *Id.* at 295.

The Government also "introduced an intercepted text message exchange between [Petitioner] and Maddox that . . . discussed $1,100 worth of cocaine. There was also a recorded phone conversation between the two men about an unknown drug, during which [Petitioner] indicated to Maddox that he had enough supply at the time." *Id.*

As to the money-laundering scheme, "Rush testified that he and Maddox wired money from the sale of drugs through Western Union to other co-conspirators and to Maddox's family members using fake names." *Id.* at 297. A DOJ financial investigator also testified for the Government and identified one transfer from Maddox to Petitioner for $900 that Petitioner received in New York to support the conspiracy. *Id.* at 297. "The investigator also tracked twenty-two more transfers totaling $8,560.00 from Maddox to his sister, Kizzy Lukerson, who is also [Petitioner]'s wife." *Id.*

Finally, as to Petitioner's charge for witness intimidation, the Government introduced the following:

5

> [a] recording of a voicemail message Maddox left for Rush, calling him a 'fucking rat bitch' and threatening that he had 'better watch his step out there nigga cause he ain't safe.' Maddox then immediately called [Petitioner] and told him to 'green light on' Rush, which an FBI cryptanalyst testified usually means to order to kill or seriously harm a person. Maddox told [Petitioner] that he was 'going to smash' and 'beat the breaks off' of Rush for cooperating with law enforcement. He also instructed [Petitioner] 'if you come in contact with Rush, don't let him talk that sweet talk shit" and 'make sure he don't talk that love talk with niggas, you know what I mean'—to which [Petitioner] responded, 'Yeah no doubt, no doubt' and 'No sir.'
>
> Maddox then called and told Ruffin that he wanted a 'universal beat down' of Rush and wanted to 'physically destroy' and 'change Rush's whole face.' Ruffin shared with Maddox that 'the goons' had already been sent 'out after' Rush.
>
> In addition, Ballinger—the jailhouse informant—testified that [Petitioner] warned him not to snitch on [Petitioner] because 'where they from, they kill snitches, and they've got enough money out there to have Ballinger and his family killed.'

*Id.* at 298.

Based on the evidence and testimony from numerous witnesses, the jury convicted the defendants on various counts, including some lesser-included offenses. *Id.* at 279. As to Petitioner, the jury convicted him of five conspiracies: (1) to distribute and to possess with intent to distribute cocaine; (2) to distribute and to possess with intent to distribute cocaine base; (3) to distribute and to possess with intent to distribute marijuana; (4) to commit money laundering; and (5) to commit witness intimidation [Doc. 638 in 2:09-cr-45]. In other words, the jury convicted Petitioner under all five counts with which he was charged [*See* Doc. 398 in 2:09-cr-45].

After the jury returned a guilty verdict against all defendants, Petitioner filed motions for a new trial[2] and for acquittal,[3] both of which were denied.[4] The Court then sentenced Petitioner to a term of imprisonment of 360 months based, in part, on the application of the Career Offender

---

[2] [Doc. 643 in 2:09-cr-45]
[3] [Doc. 644 in 2:09-cr-45]
[4] [Doc. 705 in 2:09-cr-45]

Guidelines under U.S.S.G. § 4B1.1(a) [*See* Docs. 808, 841 in 2:09-cr-45]. The Court also imposed a sentence of 8 years of supervised release and a $500 special assessment [Doc. 844 in 2:09-cr-45]. The Court also entered an order of forfeiture against Petitioner in the amount of $7 million [*See id.*; Doc. 776 in 2:09-cr-45].

Petitioner and the other defendants then appealed their sentences to the Sixth Circuit [Doc. 845 in 2:09-cr-45]. Petitioner argued on appeal that the evidence against him was insufficient[5] and the district court erred "in denying his motion for a new trial when it determined that the jury's verdict was not against the manifest weight of evidence." *Miller*, 562 F.App'x. at 299. Petitioner claimed that, as to his drug and money-laundering convictions, the proof at trial showed multiple conspiracies and not the single conspiracy with which he was charged. *Id.* at 303. Petitioner also contested his sentence on appeal. *Id.* at 308. The Sixth Circuit considered and rejected all of Petitioner's arguments and affirmed Petitioner's conviction. *Id.* at 312. The appellate court concluded that "[t]he evidence at trial presented [Petitioner] to be one of Maddox's surrogates, conducting retail sales, buying kilograms of cocaine, and operating 'trap houses' from which he sold crack cocaine. In this sense, his role was intertwined and interdependent on the other members of the conspiracies, even if he did not work with them directly." *Id.* at 304. After the Sixth Circuit's ruling, Petitioner filed a petition for a writ of certiorari with the Supreme Court [Doc. 966 in 2:09-cr-45]; however, it too was denied [Doc. 969 in 2:09-cr-45].

Petitioner then retained the firm Paul, Weiss, Rifkind, Wharton & Garrison, LLP ("Paul Weiss"), to represent him in the present 28 U.S.C. § 2255 proceeding [Doc. 1]. Paul Weiss, in turn, hired investigators who located Jamie Rush in South Carolina. One of the investigators contacted Rush by telephone. In that telephone conversation, Rush told her "that [Petitioner] was

---

[5] *Miller*, 562 F. App'x at 291.

not involved with Sunnah Maddox's drug operation. He also told [the investigator] that he had conveyed this information to the law enforcement officials who had questioned him prior to trial." [Doc. 1013 at ¶ 5 in 2:09-cr-45][6]. The two investigators then met with Rush on October 26, 2015, in Columbia, South Carolina to discuss Petitioner's involvement [*See* Docs. 1013-1014 in 2:09-cr-45].

During the meeting, Rush told the investigators that Petitioner did not have any involvement in Maddox's drug operation. "He described [ ] [Petitioner] as a stand-up guy who got roped into the investigation based on some bad circumstances." [Doc. 1014 at ¶ 5 in 2:09-cr-45]. Rush said he met with law enforcement officials on several occasions before trial and told them that Petitioner "was not at all involved." [*Id.* at ¶ 7; Doc. 1013 at ¶ 7 in 2:09-cr-45 ("Mr. Rush told us that [Petitioner] was never involved with Sunnah Maddox's drug operation.")]. Rush, however, could not recall the names of the individuals to whom he provided such information [Doc. 1013 at ¶ 8 in 2:09-cr-45; Doc. 1014 at ¶ 7 in 2:09-cr-45].

As to the phone conversation between Maddox and Petitioner where Maddox said to "green light" Rush, Rush stated that "he never took this call seriously or worried for his safety. . . . if there were any real threat on his life, [Rush] would have been placed in protective custody." [Doc. 1013 at ¶ 6 in 2:09-cr-45; Doc. 1014 at ¶ 9 in 2:09-cr-45].

Rush told the investigators that he felt that Petitioner "had gotten a 'raw deal.' He said that, since [ ] [Petitioner's] only connection was that he was married to Sunnah Maddox's sister, it was unfortunate that [ ] [Petitioner] had been lumped in with the members of the drug conspiracy." [Doc. 1014 at ¶ 10 in 2:09-cr-45].

---

[6] It should be noted that Rush did not explicitly inculpate Petitioner at trial; rather, "[t]he bulk of the government's evidence [against Petitioner] came from two jailhouse informants: Trewayne Sanders and Daniel Ballinger." *Miller*, 562 F. App'x at 295.

The investigators asked Rush to sign an affidavit attesting to the statements he had made to them. Rush told the investigators that he would need to "speak with his probation officer and consider whether he wanted to get directly involved." [*Id.* at ¶ 8]. Rush's probation officer, Jennifer Douglass, later contacted one of the investigators and stated that Rush had approached her about signing an affidavit [*Id.*]. USPO Douglass informed the investigator that she had "concerns with his participation." [*Id.*].

Approximately one month later, after several attempts to contact USPO Douglass, Petitioner's attorney, Mr. Markquart, received a call from her [Doc. 1012 at ¶ 9 in 2:09-cr-45]. USPO Douglass stated to Markquart that "she would be instructing [Rush] not to participate." [*Id.* at ¶ 12].

Later, USPO Douglass emailed Mr. Markquart [Doc. 1026-2 in 2:09-cr-45]. In that email, USPO Douglass said that she advised Rush "that if he wishe[d] to participate in [Markquart's] investigation then [she] w[ould] seek guidance from the Court in how to do so in an appropriate manner." [*Id.*]. However, Rush instructed Douglass that "he [did] not wish to participate in the investigation and in fact, the only reason he spoke to [Markquart's] investigator[s] in the first place is that they were 'being a nuisance to his friends and family.'" [*Id.*]. Rush said that he did not want to participate "and 'just wanted to get on with his life.'" [*Id.*]. USPO Douglass concluded that, if Rush changed his mind, then she would seek guidance from the Court on how to proceed. [*Id.*].

Based on the investigators' conversations with Rush, Petitioner advances the argument that the Government violated Petitioner's rights by not disclosing exculpatory evidence under *Brady v. Maryland*[7] in the form of Rush's pre-trial statements concerning Petitioner's lack of involvement in the criminal conspiracy [Docs. 1, 2]. However, due to Rush's refusal to sign an affidavit,

---

[7] 373 U.S. 83 (1963)

Petitioner was forced to rely upon the investigators' affidavits in support of his § 2255 motion. Petitioner also points out that Rush did not make any incriminating statements about him at trial even though he implicated the rest of Petitioner's co-defendants [*Id.*].

The Government responded in opposition and contends that no *Brady* violation occurred [Doc. 8]. The Government supported its response with affidavits from Assistant United States Attorneys Donald Taylor and Robert Reeves as well as three law-enforcement officials—all of whom stated that Rush did not make any statements to them to the effect that Petitioner was not involved in Maddox's drug conspiracy.[8]

## III. Analysis

### A. 28 U.S.C. § 2255 Standard

Under 28 U.S.C. § 2255(a), a federal prisoner may make a motion to vacate, set aside, or correct his judgment of conviction and sentence if he claims that the sentence was imposed in violation of the Constitution or laws of the United States; or that the court lacked jurisdiction to impose the sentence; or that the sentence is in excess of the maximum authorized by law, or is otherwise subject to collateral attack. As a threshold standard, to obtain post-conviction relief under Section 2255, a motion must allege: (1) an error of constitutional magnitude; (2) a sentence imposed outside the federal statutory limits; or (3) an error of fact or law so fundamental as to render the entire criminal proceeding invalid. *Mallett v. United States*, 334 F.3d 491, 496–97 (6th Cir. 2003); *Moss v. United States*, 323 F.3d 445, 454 (6th Cir. 2003).

A petitioner bears the burden of demonstrating an error of constitutional magnitude which had a substantial and injurious effect or influence on the criminal proceedings. *Reed v. Farley,* 512 U.S. 339, 353 (1994); *Brecht v. Abrahamson*, 507 U.S. 619, 637–38 (1993). In order to obtain

---

[8] *See* Docs. 1026-3, 1026-4, 1026-5, 1026-6, and 1026-7 in 2:09-cr-45.

collateral relief under § 2255, a petitioner must clear a significantly higher hurdle than would exist on direct appeal. *United States v. Frady*, 456 U.S. 152 (1982).

Rule 4(b) of the Rules Governing Section 2255 Proceedings in the United States District Courts requires a district court to summarily dismiss a Section 2255 motion if "it plainly appears from the face of the motion, the attached exhibits, and the record of the prior proceedings that the movant is not entitled to relief." *See also Pettigrew v. United States*, 480 F.2d 681, 684 (6th Cir. 1973) ("A motion to vacate sentence under § 2255 can be denied for the reason that it states "only bald legal conclusions with no supporting factual allegations.") (quoting *Sanders v. United States*, 373 U.S. 1, 19 (1963)). If the motion is not summarily dismissed under Rule 4(b), Rule 8 requires the court to determine, after a review of the answer and the records of the case, whether an evidentiary hearing is required. If a petitioner presents a factual dispute, then "the habeas court must hold an evidentiary hearing to determine the truth of the petitioner's claims." *Huff v. United States*, 734 F.3d 600, 607 (6th Cir. 2013) (quoting *Valentine v. United States*, 488 F.3d 325, 333 (6th Cir. 2007)). An evidentiary hearing is not required "if the petitioner's allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact." *Valentine*, 488 F.3d at 333 (quoting *Arredondo v. United States*, 178 F.3d 778, 782 (6th Cir. 1999)).

### B. Hearsay Objection to Affidavits

Petitioner has submitted affidavits signed by his counsel's investigators in support of the alleged *Brady* violations. The Government objects to the affidavits on the basis that they contain inadmissible hearsay, *to wit*, the affidavits purport to represent statements Mr. Rush made to the investigators about what he had previously told law enforcement.

11

In dealing with this hearsay objection, the starting point is Rule 8(a) of the *Rules Governing § 2255 Proceedings*, which provides in relevant part, "If the motion is not dismissed, the judge must review the answer, any transcripts and records of prior proceedings, and any materials submitted under Rule 7 to determine whether an evidentiary hearing is warranted." While the *Federal Rules of Evidence* ordinarily exclude affidavits as hearsay, such rules are inapplicable to § 2255 proceedings to the extent the Supreme Court has prescribed some other rule for admitting or excluding evidence. *See* Fed. R. Evid. 1101(e). And, here, the Supreme Court has prescribed such a rule. Specifically, Rule 7 of the *Rules Governing § 2255 Proceedings* permits the consideration of affidavits as part of the record. Taken together, these rules authorize the Court to decide whether to consider affidavits and to hold a hearing. *United States v. Coleman*, No. 13-65-JMH-CJS, 2014 WL 5106361, at *11, n. 1 (E.D. Ky. Oct. 6, 2014); *accord United States v. McIntire*, No. 3:08-cr-038, 2010 WL 374177, at *6 (S.D. Ohio Jan. 29, 2010) ("The *Federal Rules of Evidence*, which ordinarily exclude affidavits as hearsay, are inapplicable to § 2255 proceedings to the extent that the Rules adopted by the Supreme Court for the conduct of those proceedings allow affidavits to be considered."). Therefore, despite the hearsay objection, the Court finds that it is appropriate to consider the affidavits in this case in connection with its decision as to whether Plaintiff is entitled to an evidentiary hearing. *See Valentine v. United States*, 488 F.3d 325, 334 (6th Cir. 2007) (referencing *Turner v. United States*, 183 F.3d 474, 477 (6th Cir. 1999)) (noting that Petitioner's "burden to show his right to a hearing is significantly lower than his burden to show he is entitled to § 2255 relief.").

**C.    Failure to Disclose Exculpatory Evidence in Violation of *Brady***

In their affidavits, Petitioner's counsel's investigators state that Rush told them that he explained to law enforcement in pretrial interviews that Petitioner had nothing to do with Maddox's

drug-distribution ring. Petitioner contends that the Government committed a *Brady* violation when it failed to disclose Rush's exculpatory statements to Petitioner's counsel.

Within the context of *Brady*, "suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material, either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). "There are three components of a true *Brady* violation: [t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Prejudice is established by showing that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 281 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

The Government does not take issue with the fact that: (1) Rush's alleged pre-trial statements about Petitioner were favorable to Petitioner; and (2) the Government did not disclose to Petitioner's counsel that Rush had made exculpatory statements about Petitioner.[9] Assuming for purposes of argument that Rush did provide exculpatory information to the Government that was not shared with Petitioner's counsel in advance of trial, the remaining issue in the *Brady* analysis is to determine whether such omission prejudiced Petitioner in defense of his case.

Petitioner contends that the Government's failure to divulge Rush's exculpatory statements prejudiced the defense of his case because such statements go to the very heart of the issue of guilt

---

[9] As will be discussed below, the Government asserts that Rush never made the alleged exculpatory statements about Petitioner to law enforcement. Consequently, it could not have disclosed this information to Petitioner.

13

or innocence. Ultimately, Petitioner was convicted on Counts 1, 3, 5, 6 and 20 of the Indictment for conspiracy to distribute cocaine, crack, and marijuana, and to commit money laundering and witness intimidation. [*See* Doc. 398 in 2:09-cr-45]. Petitioner maintains that the jury would have found him to be not guilty of all charges had the Government shared with them Rush's alleged exculpatory statements. Petitioner also points out that that Rush did not implicate Petitioner in the conspiracy during his lengthy trial testimony; therefore, his exculpatory statements would not have contradicted his trial testimony. Petitioner also relies upon *United States v. Tavera*, a case involving AUSA Taylor in which a finding was made that Taylor did not disclose exculpatory evidence in light of *Brady*. 719 F.3d 705 (6th Cir. 2013).

While *Tavera* provides a helpful *Brady* analysis, this Court does not conclude—based on the *Tavera* court's finding that AUSA Taylor violated *Brady*—that a similar violation occurred in this case. Rather, the Court will fully and fairly apply the *Brady* analysis without any presuppositions. *See Montgomery v. Bobby*, 654 F.3d 668, 697 (6th Cir. 2011) (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) ("Assessing whether a *Brady* violation entitles a petitioner to relief does not involve a discretionary inquiry with multiple correct answers. Rather, it involves a legal determination that considers the totality of a case's facts with reference to the excluded evidence in order to determine whether that evidence 'undermines confidence in the outcome of the trial.'").

After reviewing the trial and appellate records against the backdrop of the *Brady* standard, the Court cannot conclude that a jury would have found Petitioner guilty beyond a reasonable doubt as to the elements of the drug conspiracy counts of the Indictment had the jury been apprised of Rush's alleged exculpatory statements. *See Kyles*, 514 U.S. at 435 (noting that exculpatory evidence is that which would "undermine confidence in the verdict."). While it is true that the

14

"[t]he bulk of the government's evidence [against Petitioner] came from two jailhouse informants . . . .",[10] it was Rush who testified about the inner workings of Maddox's drug-distribution ring. *See Miller*, 562 F. App'x at 278-79 (highlighting Rush's extensive trial testimony). Rush's testimony about the drug conspiracy seemed to be pivotal to the jury's findings. Had Rush testified that Petitioner was not involved in the drug conspiracy—as Petitioner now alleges Rush told law enforcement before trial—the Court cannot conclude that Petitioner would have been convicted. Therefore, the Court finds that Petitioner has satisfied the elements of the *Brady* analysis and is entitled to an evidentiary hearing.[11]

### D.   The Government Denies that it Failed to Disclose Exculpatory Evidence

As indicated, Petitioner's counsel's investigators assert that Rush stated that he told law-enforcement officials that Petitioner had nothing to do with Maddox's drug conspiracy. The Government, on the other hand, insists that Rush made no such statements to law enforcement, and it was not in possession of the exculpatory evidence that Petitioner asserts was improperly withheld from him. Petitioner is entitled to an evidentiary hearing because the investigators' affidavits directly contradict those presented by the prosecution and law enforcement. *See Valentine*, 488 F.3d at 334 (referencing *Turner*, 183 F.3d at 477) (noting that Petitioner's "burden to show his right to a hearing is significantly lower than his burden to show he is entitled to § 2255 relief.").

There is a factual dispute as to whether Rush told law enforcement that Petitioner was not involved in the drug conspiracy. In reviewing a § 2255 motion in which a factual dispute arises,

---

[10] *Miller*, 562 F. App'x at 294-95.
[11] Section § 2255(f)(4)'s requirement that a petitioner exercise reasonable diligence to discover the factual predicate underlying his claims does not require a petitioner to repeatedly seek out information that the government unconstitutionally failed to disclose despite having notice that petitioner sought the very information suppressed. *Jefferson v. United States*, 730 F.3d 537, 545 (6th Cir. 2013)

15

"the habeas court must hold an evidentiary hearing to determine the truth of the petitioner's claims." *Id.* at 333 (quoting *Turner*, 183 F.3d at 477) (internal quotation marks omitted). "More is required, however, than mere assertions of innocence." *Id.* In instances where a petitioner presents an affidavit containing "a factual narrative of the events that is neither contradicted by the record nor 'inherently incredible'" and the government offers nothing more than "contrary representations" to contradict it, the defendant is entitled to an evidentiary hearing. *Id.* at 334.

## IV. Conclusion

For the reasons set forth above, the Court finds that Petitioner is entitled to an evidentiary hearing to resolve the disputed facts which underlie his § 2255 motion. Petitioner's Motion to Vacate, Set Aside or Correct his Sentence under § 2255 [Doc. 1] is, therefore, **GRANTED IN PART**, but only to the limited extent that Petitioner will be given an opportunity to participate in an evidentiary hearing. To this end, the Court will provide written notification to the parties of a scheduled date for the evidentiary hearing.

Petitioner's Motion for Discovery [Doc. 11] is also **GRANTED**, and Petitioner may proceed with discovery as outlined in his Motion.

**IT IS SO ORDERED.**

ENTER:

s/ Leon Jordan
United States District Judge